# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TROY WHITE & KYLA WHITE,
Individually and as Next Friends
for H.W., H.W.,T.W., H.W., H.W.,
and H.W.

Plaintiffs,

Case No.:

Honorable Chief Judge Jonker

            v.

OPEN DOORS KALAMAZOO;
CITY OF KALAMAZOO; CITY OF
KALAMAZOO-CITY MANAGER,
JAMES K. RITSEMA, Individually
and in his official capacity,

Defendants.

_____/

Attorney John R. Beason III
(D.C. Bar No.1721583)
**The J.R. Beason Firm PLLC.**
Attorney for the Plaintiffs
853 McAlister St. (Shamika Jordan Way)
Benton Harbor, MI 49022
JRBeason3@TheJRBeasonFirm.com

(1)

## **PLAINTIFFS' COMPLAINT AND REQUEST FOR DAMAGES**

These Plaintiffs, residents of Kalamazoo, MI, through counsel, comes and brings this action for tort based constitution and federal law violations against the Defendants, namely: violations of the Constitution's free exercise of religion, equal protection, and due process clauses, as well as violations of federal civil rights acts and codes of regulations, substantiating: racial discrimination in housing programs, gross negligence, battery, assault, private nuisance, breach of contract, unjust enrichment, retaliatory, wrongful eviction, and intentional infliction of emotional distress.  This complaint is brought on behalf of a family who from at least 2018 to 2022, have experienced irreparable bodily injury, mental anguish, and emotional distress due to the unknown presence and ingestion of toxic lead contaminants in the duplex they leased from the Defendants.  The Plaintiffs assert that these violations of their unalienable constitutional rights were caused by the Defendants' racist custom of deliberate indifference and nonfeasance in the performance of non-discretionary duties on behalf of African-American citizens.

(2)

## **INTRODUCTION**

2

This is a civil action asserting claims under the Constitution, federal, and state law alleging violations of equal protection, due process, disparate treatment, gross negligence, assault, battery, unjust enrichment, and intentional infliction of emotional distress. in violation of the U.S. Const. Amend. I, U.S. Const. amend. V, U.S. Const. amend. XIV., Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 3604, 42 U.S.C. § 3613, 42 U.S.C. § 4852d, 42 U.S.C.A. § 300g-6, 24 C.F.R. § 35.88, 24 C.F.R. § 35.94, 24 C.F.R. § 35.96, 24 C.F.R. § 35.315, 24 C.F.R. § 35.320, 24 C.F.R. § 35.325, 24 C.F.R. § 35.715, 24 C.F.R. § 35.720, 24 C.F.R. § 35.1220, 24 C.F.R. § 35.1355, 24 C.F.R. § 100.65, 40 C.F.R. § 745.107, 40 C.F.R. § 745.113, 40 C.F.R. § 745.118, 40 C.F.R. § 745.227, MI Const. Art 1 §17, M.C.L.A § 333.5475a, M.C.L.A. § 554.139, M.C.L.A. § 600.2959, and M.C.L.A. § 750.81. The Plaintiffs requests a jury trial and seeks exemplary, compensatory, and equitable relief, as well an award of reasonable attorney fees, and cost pursuant to the U.S Constitution, Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 1983, 42 U.S.C. § 3613, 24 C.F.R. § 35.96, and M.C.L.A. § 600.6305.

(3)

## JURISDICTION & VENUE

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C § 139, as all plaintiffs and the majority of the Defendants

reside in the Western District of Michigan, as well the occurrence of the significant and relevant incidents giving rise to suit taking place in Kalamazoo, MI; within the jurisdiction of this Court.

(4)

## THE PARTIES

(5)

## THE PLAINTIFFS

Plaintiffs are citizens of the State of Michigan and residents in the City of Kalamazoo, within the County of Kalamazoo.

(6)

Plaintiffs Troy and Kyla White, parents and next friends for their six minor children, unknowingly consumed toxic water for three years due to the deliberate indifference and custom of habitual nonfeasance established and maintained by these Defendants. Three of the six children have been confirmed to be poisoned by lead from the Defendants' property. The Plaintiffs were displaced for several months after paying rents for a contaminated living space and ultimately evicted in violation of the lease agreement, which was fraudulent and entered into under false pretenses due to the defendants' failures to disclose.

(7)

## THE DEFENDANTS

Defendants City of Kalamazoo, City Manager James Ritesema, and Open Doors Kalamazoo are West Michigan  citizens, municipal, and corporate entities with active primary places of business in the County of Kalamazoo, within the jurisdiction of this Court.

(8)

## FACTS GIVING RISE TO COMPLAINT

(9)

On the front page of its public website, in bold letters, Defendant Open Doors Kalamazoo states, "Everyone needs a stable place to live." and goes on to detail that: "Open Doors helps local families achieve housing success. Building relationships to overcome homelessness with a commitment to diversity, equity, and inclusion in response to God's love for ALL."  Taking the Defendants' marketing of themselves as true, the White Family enlisted as a program participant and beneficiary of Open Doors Kalamazoo community initiatives for low-income families in 2016.  From 2016 to 2018, the Plaintiffs worked with the Defendants to find a suitable residence. After visiting 1217 North Street, the Plaintiff asked the Defendant if the property had any lead problems in the past because she was concerned for her new infant

daughter.   The Defendant assured the Plaintiffs that the property did not have a history of lead repair or any lead-hazard concerns.   In 2018, the Plaintiffs leased 1217 North Street, a duplex, from the Defendants.   The property was built in 1894, which made it one hundred and twenty four years old when the Plaintiffs took possession and began paying rents for it.   The property is now one hundred and twenty eight years old.   The Plaintiffs were not given any information pertaining to lead, procedures to check for lead, upcoming inspections, or any history of the presence of lead in the property.   In the four years that the White Family was living in the property, at no point did Defendants, neither the City nor Open Doors Kalamazoo, conduct or mention lead inspections or anything related to the history of lead remediation in the unit.   In May of 2022, half of the children were found to have elevated levels of lead in their blood, constituting lead poisoning, by the Kalamazoo County Community Health Department.   When the Plaintiffs notified the lessor Defendant about the presence of toxic lead in the children and of the need for an inspection to be done at the property, the Defendants from Open Doors retorted that the Plaintiffs should clean their children more thoroughly, essentially blaming the children's lead poisoning on the filthy ways of their parents, a racial animus infused attack on the Plaintiffs parenting and hygiene.   Furthermore, the next day, a child protection services investigation case was opened against the Plaintiffs.   That CPS inspection of the home happened immediately and the case was dropped after thirty

days.   The Plaintiffs believe the Defendants initiated a child protective services investigation against them as retaliation and in an attempt to shift liability for their injuries back on to the Plaintiffs themselves.   The child protective investigation revealed that the Defendants leased the Plaintiffs hazardous, inside locking doors, which the Plaintiffs self-corrected at their own expense prior the conclusion of the investigation.   The Plaintiffs were found to be fit parents, and as any competent lessor would have known, not the source of any lead-based injuries suffered by their children.

(10)

After over a month or so had passed, an inspection was finally performed on the property, and officially confirmed excessive levels of lead in the paint, water, and other areas of the home.   In July of 2022, the Defendants elected to move the Plaintiffs, a growing eight person family, into a single hotel room, where they remained until February of 2023.   After being forced into the small confines of a single hotel room for months, a far cry from what they contracted and leased for, the Defendants informed the Plaintiffs that they were costing them too much money, and followed that up with an ultimatum of them returning to the property or Open Doors Kalamazoo would be severing the lease agreement and discontinuing the slight and insufficient lodging they had.   In February of 2023, the Defendants discontinued

lodging for the Plaintiffs and made them homeless, without shelter.  Troy and Kyla White were eight months pregnant with their newest child when the family was wrongfully displaced by the Defendants.  The Defendants denied the Plaintiffs the adequate process mandated under federal and state law and conspired to violate civil rights when they knowingly leased a contaminated property, failed to disclose its lead history, warnings, and avoided lead inspections for several years.  The Plaintiffs are suffering from homelessness, sleeplessness, body aches, headaches, learning disorders, development disorders, autism, mental anguish, humiliation, economic losses, and a lessened quality of life as a direct result of the enforcement of racial animus through nonfeasance and deliberate indifference to the imminent dangers and irreparable harms caused by the defendants establishment and enforcement of a habitual custom of ignoring non-discretionary duties when they apply to their Black Americans program participants and constituents.  As such, the Plaintiffs have opted to file suit in federal district court.

(11)

## THE PLAINTIFF CLASS' ALLEGATIONS

(12)

The Plaintiffs realleges paragraphs 1-12

(13)

## COUNT I.

### VIOLATIONS OF  FOURTEENTH AMENDMENT EQUAL PROTECTION, DUE PROCESS: CUSTOM OF DELIBERATE INDIFFERENCE, VIOLATIONS OF SEC.1983-RIGHTS TO BODILY INTEGRITY, 24 C.F.R. § 35.94, 24 C.F.R. § 35.325 (All 1Defendants)

(14)

The Plaintiffs reallege paragraphs 1-14.

(15)

The Defendants violated the Plaintiffs constitutional rights to bodily integrity, equal protection under the law, substantive, and procedural due process when they deliberately denied them the statutory protections mandated under law, thereby causing them to be poisoned and traumatized by their unknown exposure to and digestion of highly toxic lead in their leased dwelling.  The Defendants allowed and caused the leasing of a home to the Plaintiffs that was infested with toxic lead for several consecutive years while simultaneously failing to comply with their statutorily mandated duties to warn and inspect the property for contamination prior to leasing it, and during the course of its lease.  The Defendants' established and maintained a racially discriminatory custom of nonfeasance and deliberate indifference to their non-discretionary duties under federal and state law, which caused the substantial irreparable harms of lead poisoning, economic, and non-economic damages to the Plaintiffs.

(16)

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1-Privileges. "Nor be deprived of life, liberty, or property, without due process of law" U.S. Const. amend. V.  "The substantive due process aspect of the Fourteenth Amendment protects against conscience-shocking deprivations of liberty." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).  "The liberty interests preserved by the Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth Amendment, include "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska, 262 U.S. at 399; see also Ingraham v. Wright, 430 U.S. 651, 673 (1977). Among the historic liberties long cherished at common law was the right to be free from "unjustified intrusions on personal security." See Ingraham, 430 U.S. at 673. As far back as 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others." Kallstrom v. City of Columbus, 136 F.3d 1055, 1062 (6th Cir. 1998).

(17)

""Deliberate indifference" describes a state of mind more blameworthy than negligence; it requires the showing of a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994); Napier, 238 F.3d at 742. "To establish that defendants acted with deliberate indifference, plaintiff must show that they both

knew of and disregarded an excessive risk of harm; that they were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they actually draw the inference, but consciously disregarded it." *Farmer*, 511 U.S. at 837-39. *Soles v. Ingham County*, 316 F. Supp. 2d 536, 542 (W.D. Mich. 2004).  "Punitive damages may be awarded in a Fair Housing Act case. See42 U.S.C. § 3613(c)(1). The Sixth Circuit applies the standard from Smith v. Wade,461 U.S. 30, 103 S. Ct. 1625 (1983), and Kolstad v. American Dental Association,527 U.S. 526, 119 S. Ct. 2118 (1999) (dealing with punitive damages in § 1983 cases and Title VII cases), to punitive damage awards under the Fair Housing Act. See Preferred Props., Inc. v. Indian River Estates, Inc.,276 F.3d 790, 799 (6th Cir. 2002). Under that standard, a trier of fact may award punitive damages when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally-protected rights of others. Id. A plaintiff need not show that a defendant's conduct was egregious. Id. at 800. *Williams v. American Homestead Management*, No. 4:04-CV-56, at *3 (W.D. Mich. May 11, 2005).

(18)

"Under § 1983, an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." 42 U.S.C.A. § 1983. "Violating a person's bodily integrity is a grave deprivation of their liberty, against

which deprivation substantive due process provides protection." <u>In re Flint Water Cases</u>, 960 F.3d 303 (6th Cir. 2020).  "By its own terminology, § 1983 grants a cause of action to the party injured and, accordingly, a § 1983 action for deprivation of civil rights is an action personal to the injured party." 42 U.S.C.A. § 1983. <u>Blair v. Harris</u>, 993 F. Supp. 2d 721 (E.D. Mich. 2014).  "The state-created danger doctrine allows plaintiffs to bring due process claims under § 1983 for harms caused by private actors—an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.* , 542 F.3d 529, 534 (6th Cir. 2008) ; *Barber v. Overton* , 496 F.3d 449, 458 (6th Cir. 2007). *Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019). The private and municipal defendants possessed statutory, non-discretionary duties to disclose the history of lead in the rental unit, provide warnings and information about lead contamination, to regularly inspect the residence for lead, and to immediately inspect the home for lead when contamination of child-tenants was confirmed.  The Defendants deliberately denied the Plaintiffs the benefits and privileges entitled to them under the law when they intentionally avoided acting on any of their non-discretionary duties.

(19)

The Defendants violated the Plaintiffs' rights to equal protection under numerous laws designed to prevent their exposure to toxic lead, including several codes of

federal regulations, the fair housing act, civil rights acts, state statutes, and city ordinances, causing irreparable physical injuries, mental and emotional suffering, and economic losses.   The deliberate indifference of the Defendants "shocks the conscience, infringes upon the decencies of civilized conduct, is so brutal and so offensive to human dignity, and interferes with rights implicit in the concept of ordered liberty." U.S. Const. Amend. 14. Guertin v. State, 912 F.3d 907 (6th Cir. 2019).  The Defendants habitual custom of deliberate indifference to imminent harm of their constituents and tenants, manifested by years of failures to act on their non-discretionary duties in regards to these Plaintiffs, caused them to be exposed to toxic lead contaminants for four consecutive years, then forced to live in untenable, in-humane conditions for several months, and finally compelled into homelessness in violation of the Constitution, federal, state, local laws, and human decency.

(20)

## COUNT II.

## VIOLATIONS OF THE FIRST AMENDMENT FREE EXERCISE OF RELIGION (All Defendants)

(21)

The Plaintiffs reallege paragraphs 1-21.

(22)

13

The Defendants violated the fourth amendment of the Michigan State Constitution and the first amendment of the Federal Constitution when their combined failures to warn, inspect, and educate about lead contamination caused the Plaintiffs continuous exposure to toxic lead contaminants for a substantial amount of time, directly causing irreparable harm to the Plaintiffs.  The Defendants obstructed the Plaintiffs from practicing their religion according to the dictates of their own minds and prohibited the free exercise of their religions when they forced them to practice those religions using neurotoxic lead-water and within a lead infested property. Unbeknownst to the Plaintiffs, no amount of sanitizing or disinfecting the property they leased from the Defendants could have made it proper for the purposes for which they contracted right of possession, part of which was to maintain a place of worship for the fulfillment of religious tenets.

(23)

The right to be free from excessive toxic-lead contamination in the home runs parallel to the semitic practitioners' requirements of cleanliness.  In the semitic traditions, the Book of Isaiah is generally accepted as the first of the major prophetic books of the Hebrew Bible.  In the old testament, the Prophet Isaiah (peace be upon him) revealed: "My people will live in peaceful dwelling places, in secure homes, in undisturbed places of rest." Isaiah 32:18.  The Angel Gabriel, (peace be upon him), divulged in the Quran: "We revealed to Moses and his brother, "Appoint houses for

your people in Egypt. Turn these houses into places of worship, establish prayer, and give good news to the believers!" Yunas 10:87.  Establishing the home as a secure place of worship, is basic semitic doctrine, where one prays and acts on all religious dictates at home and congregates in communion at least once per week outside the home in a designated temple or place of worship.  Furthermore, allowing unjust enrichment and exploitation of any kind is forbidden in the religious practices of the Plaintiffs.  The Prophet Isaiah, (peace be upon him), revealed: "No longer will they build houses and others live in them, or plant and others eat. For as the days of a tree, so will be the days of my people; my chosen ones will long enjoy the work of their hands." Isaiah 65:22.  The Plaintiffs worked and earned the monies they paid in rents as righteous servants of their Lord, and in exchange, were given a lead contaminated rental unit that was unfit for living and worship.  The Plaintiffs were denied the religious right to "enjoy the work of their hands" as well as to have a home fit for living and worship.  The Defendants actions made the Plaintiffs religious obligations unattainable and severely burdened the free exercise of their religion.

(24)

"Every person shall be at liberty to worship God according to the dictates of his own conscience." Mich. Comp. Laws § 4.  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" U.S. Const.

amend. I.  "An essential element to a claim under the free exercise clause is some form of governmental coercion of actions which are contrary to religious belief." *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Board of Education v. Allen,* 392 U.S. 236, 248-249, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

(25)

In nearly all religions, and especially the Abrahamic faith of the Plaintiffs, safe water and an uncontaminated environment are essential to the proper practice of the religion, and both substantiates and symbolizes an important role in everyday religious practice and ideology.  In the Judaic and Christian faiths, water has the power to purify, to provide deliverance, and it can also destroy evil and repel enemies as in the stories of Noah (as) and the Flood (Genesis 6:17) and the flight of Moses (as) and the Israelites from Egypt (Exodus 14:1-15:21).  "Wash yourselves, make yourselves clean; Remove the evil of your deeds from My sight.  Cease to do evil." (Isaiah 1:16).  "Then I will sprinkle clean water on you, and you will be clean; I will cleanse you from all your filthiness and from all your idols." (Ezekiel 36:25). By secretly forcing the Plaintiffs to consume neurotoxic lead-water and live in a dangerously lead infested home, these Defendants both prevented the Plaintiffs from practicing their religions and caused them to violate the tenants of their religions without their knowledge, and in violation their constitutional rights.  When the

Plaintiffs became aware of the presence of toxic lead, an unwarranted substantial burden was placed upon their ability to properly practice their religion, as they were forced to live in a small hotel room and relinquish the dwelling that they intended to serve as their spiritual and physical abode.

(26)

Had the Defendants properly complied with their statutory duties and standards of care, the Plaintiffs would not have been exposed to toxic lead contaminants nearly long enough for the development of elevated lead poisoning. Had the defendants not deliberately refused to act out their non-discretionary duties, the Plaintiffs would have been notified with timely, understandable, pertinent information warning them of the hazards, probabilities, and precautions to be taken against toxic lead contaminants.  Having said information would have allowed the Plaintiffs to practice their religion according to their own dictates and not the dictates of the Defendants' legally inadequate living conditions.

(27)

## COUNT III.

## RACIAL DISCRIMINATION - CIVIL RIGHTS ACTS & HOUSING REGULATION VIOLATIONS: 42 U.S.C.A. § 2000d, 42 U.S.C.A § 1983, 42 U.S.C. § 4852d,, 24 C.F.R. § 100.65, - DISCRIMINATION IN HOUSING

(28)

The Plaintiffs reallege paragraphs 1-28.

(29)

The Defendants violated the Plaintiff's constitutional rights to equal protection under the law and freedom from racial discrimination under the federal and state civil rights acts when they intentionally leased the Plaintiffs a lead infested home, deliberately refused to act on their non-discretionary duties to provide adequate process in regards to lead regulations, and purposefully broke the warranties imbedded in their lease agreement.

(30)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d.  "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." Mich. Comp. Laws § 2. "Nor be deprived of life, liberty, or property, without due process of law" U.S. Const. amend. V.  Under § 1983, an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute. 42 U.S.C.A. § 1983.  These Plaintiffs

were denied the proper access to adequate process and housing when the Defendants leased them a lead infested rental unit after avoiding acting on their mandatory statutory duties. The Defendants continued to act in nonfeasance, excluding the Plaintiffs from equal participation in federally funded programs in contravention of federal law when they continued to accept rents without acting out there non-discretionary duties to inspect for and remediate lead-based dangers.

(31)

"Title VI confers a private right of action only for intentional discrimination. *Alexander v. Sandoval*, 532 U.S. at 280. *Moralez v. Mich. Emp't Relations Comm'n*, No. 1:17-cv-886, at *13 (W.D. Mich. Sep. 10, 2018).  ""Federal financial assistance" is defined in accompanying regulations as "any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty)" involving federal assistance. 28 C.F.R. Section(s) 41.3(e) (1995)." *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277 (6th Cir. 1996).  After accepting federal financial assistance, the Plaintiffs deliberately and intentionally leased the Plaintiffs a home unfit for the myriad of purposes for which they knew it was contracted for, and in an infested state in which they would not have leased a non-protected class lessee.  Defendant Open Doors discriminated against the Plaintiffs when they purposely leased the Plaintiffs a rental unit infested with excessively high levels of lead contamination in which they would not have leased their non-minority program participants.  The

Defendants racial animus and racist disposition manifested in their assertions that the Plaintiffs lead poisoning was caused by their own lack of cleanliness, showing the possession of active racists ideologies disconnected from a coherent understanding of and intention to uphold their statutory duties as lessors.  The Defendants' erroneous and impossible assertions revealed that they never acted on nor intended to provide equal treatment under the law by acting out their statutory non-discretionary duties as lessors in the State of Michigan and the United States of America.

(32)

When the Defendants failed to provide the same process to these Plaintiffs that they normally provide to their non-minority program participants by intentionally leasing them a lead infested contaminated dwelling, they violated the Plaintiff's constitutional rights to equal protection under the law and inflicted illegal racial discrimination in contravention of the federal and state civil rights acts, as well the federal and state Constitutions.

(33)

**COUNT IV.**

**VIOLATIONS OF THE "RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT":  DELIBERATE INDIFFERENCE, FAILURE TO WARN, WILLFUL NEGLECT OF DUTY,  HABITUAL LEAD EXPOSURE**

**REGULATION VIOLATIONS; 42 U.S.C. § 4851, 42 U.S.C.A. § 300g-6, 40**

**C.F.R. § 745.107, 40 C.F.R. § 745.113, 40 C.F.R. § 745.119, 40 C.F.R. § 745.227,**

**M.C.L.A. § 333.5475a M.C.L.A.  § 750.478 (All Defendants)**

(34)

The Plaintiffs reallege paragraphs 1-34.

(35)

The Defendants habitually violated the Residential Lead-Based Paint Hazard Reduction Act when they leased the Plaintiffs a rental unit that was over a hundred years old without providing them an EPA mandated lead hazard pamphlet, nor did they disclose to the Plaintiffs the presence of any known lead-based paint history, any known lead-based paint hazards, or a single lead hazard evaluation report.  The Defendants failed to remove lead fixtures and piping in the unit before leasing it and also failed to have the unit inspected by the proper parties or statutory methodologies before leasing it to the tenants.  The City of Kalamazoo and its staff failed to work cooperatively with landlords to help ensure safe, decent and sanitary rental housing through the systematic inspection of rental properties pursuant to the requirements prescribed by their own city ordinances.

(36)

"The regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall- (A) provide

the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act [ 15 U.S.C. 2686 ];(B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor." 42 U.S.C. § 4852d. "WHEREAS, Section 1018 and the implementing regulations, found at 24 C.F.R. Part 35, Subpart A, and 40 C.F.R. Part 745, Subpart F, require, among other things, that the owners and managing agents of residential properties subject to the law make certain disclosures and provide certain records concerning Lead-Based Paint and Lead-Based Paint Hazards to tenants when a new lease is entered into." *U.S. v. Sierra*, No. 1:09-CV-1149, at *35 (W.D. Mich. Mar. 3, 2009).

(37)

"(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.(b) Prohibited actions under this section include, but are not limited to:(1) Using different provisions in leases or contracts of sale, such as those relating to rental charges, security deposits and the terms of a lease and those relating to down payment and closing requirements,

because of race, color, religion, sex, handicap, familial status, or national origin.(2) Failing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.65. "It is the policy of the City of Kalamazoo that its staff will work cooperatively with landlords, tenants, neighborhood associations and other interested groups and individuals to help ensure safe, decent and sanitary rental housing through the systematic inspection of rental properties pursuant to the requirements prescribed by this chapter. B. The owner and/or responsible local agent shall contact the City to schedule the systematic inspection in a timely manner such that the certificate of compliance can be issued prior the expiration of the then-current certificate of compliance." § 17-12.1, Kalamazoo City Code. "The City shall not issue a certificate of compliance unless a current registration is in effect, the responsible local agent is properly designated, and an inspection, as required elsewhere in this chapter, has determined that the premises satisfies the minimum standards and other provisions of the City Code of Ordinances." § 17-19B, Kalamazoo City Code. The City of Kalamazoo and its city manager caused certificates of compliance to be issued for the unit in question when it did not satisfy the minimum standards and other provisions of the City Code of Ordinances, which caused the long term exposure to excessive levels of lead, the toxic poisoning of several young children, and the wrongful displacement of an entire growing family.

(38)

"In 1992, Congress enacted the RLPHRA based upon its findings that low-level lead poisoning, caused primarily by the ingestion of household dust containing lead from deteriorating or abraded lead-based paint, endangers the health and development of children living in as many as 3.8 million American homes. 42 U.S.C. § 4851. The RLPHRA was enacted to, among other things, "develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible" and to "educate the public concerning the hazards and sources of lead-based paint poisoning and steps to reduce and eliminate such hazards." *Roberts v. Hamer*, 655 F.3d 578, 581 (6th Cir. 2011).  "In one of the most significant cases of the last century, the United States Supreme Court declared that "education is perhaps the most important function of state and local governments." *Brown v. Topeka Bd. of Ed.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). " *LM v. State*, 862 N.W.2d 246, 262 (Mich. Ct. App. 2014).   Under the federal framework, the process of leasing and selling homes has been converted into a mandatory conduit for increasing public awareness about the dangers of toxic lead in residential living spaces.  Furthermore, the law creates a private claim for these lessee Plaintiffs against defendants who run afoul of these regulations leading to lead-based injuries.

(39)

"In addition to providing for public enforcement of its substantive provisions through fines and injunctions, the RLPHRA authorizes private enforcement through civil actions: "Any person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3). *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011).

(40)

The Defendants habitually violated the Residential Lead-Based Paint Hazard Reduction Act when they leased the Plaintiffs a rental unit that was over a hundred years old without ensuring that it was fit for habitability, nor did they disclose to the Plaintiffs the presence of a known lead paint history, known lead hazards, or a single lead evaluation report. The Defendants failed to remove lead fixtures and piping in the unit before leasing it and also failed to have the unit inspected by the proper parties or statutory methodologies before issuing certificates of compliance and leasing it to the Plaintiffs. The City of Kalamazoo and its staff, led by the city manager, failed to act on their non-discretionary duties with their co-defendant to help ensure safe, decent and sanitary rental housing through the systematic inspection of rental properties pursuant to the requirements prescribed by their own city ordinances, state, and federal laws.

(41)

## COUNT V.

## GROSS NEGLIGENCE: HABITUAL VIOLATIONS OF "RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT":  42 U.S.C. § 4851, 42 U.S.C.A. § 300g-6, 40 C.F.R. § 745.107, 40 C.F.R. § 745.113, 40 C.F.R. § 745.119, 40 C.F.R. § 745.227, M.C.L.A. § 333.5475a M.C.L.A.  § 750.478 (All Defendants)

(42)

The Plaintiffs reallege paragraphs 1-42.

(43)

The Defendants acted with gross negligence when they established and sustained a pattern of consistently and flagrantly violating a multitude of lead based hazard reduction statutes and failing to correct, remedy, or cure said  multitude of regulatory violations for several years.

(44)

"Gross negligence" is conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." McLain v. Lansing Fire Dep't, 309 Mich. App. 335, 869 N.W.2d 645 (2015).  "Under Michigan law, "gross negligence" is an almost willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." Mich. Comp. Laws Ann. § 691.1407. 194 F.Supp.3d 658.

(45)

"The regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall- (A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act [ 15 U.S.C. 2686 ];(B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor." 42 U.S.C. § 4852d. "WHEREAS, Section 1018 and the implementing regulations, found at 24 C.F.R. Part 35, Subpart A, and 40 C.F.R. Part 745, Subpart F, require, among other things, that the owners and managing agents of residential properties subject to the law make certain disclosures and provide certain records concerning Lead-Based Paint and Lead-Based Paint Hazards to tenants when a new lease is entered into." *U.S. v. Sierra*, No. 1:09-CV-1149, at *35 (W.D. Mich. Mar. 3, 2009).

(46)

"(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.(b) Prohibited actions under this

section include, but are not limited to:(1) Using different provisions in leases or contracts of sale, such as those relating to rental charges, security deposits and the terms of a lease and those relating to down payment and closing requirements, because of race, color, religion, sex, handicap, familial status, or national origin.(2) Failing or delaying maintenance or repairs of sale or rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.65.   The Defendants delayed maintenance and repairs in the dwelling of the Plaintiffs because they are Black American citizens, and instead of acting on their non-discretionary duties to inspect the home within fifteen days of a child being found with lead contamination, they instead are believed to have initiated a child protection investigation against the Plaintiffs.   Nevertheless, the Defendants denied the Plaintiffs their rights under law when they leased them a lead infested home, failed to inspect it, and when their failures caused injuries, they failed to inspect the home within the statutory regulated time.

(47)

"(1) A risk assessment shall be conducted only by a person certified by EPA as a risk assessor and, if conducted, must be conducted according to the procedures in this paragraph. (2) A visual inspection for risk assessment of the residential dwelling or child-occupied facility shall be undertaken to locate the existence of deteriorated paint, assess the extent and causes of the deterioration, and other potential

28

lead-based paint hazards. (3) Background information regarding the physical characteristics of the residential dwelling or child-occupied facility and occupant use patterns that may cause lead-based paint exposure to one or more children age 6 years and under shall be collected. (4) The following surfaces which are determined, using documented methodologies, to have a distinct painting history, shall be tested for the presence of lead:(i) Each friction surface or impact surface with visibly deteriorated paint; and(ii) All other surfaces with visibly deteriorated paint. (5) In residential dwellings, dust samples (either composite or single-surface samples) from the interior window sill(s) and floor shall be collected and analyzed for lead concentration in all living areas where one or more children, age 6 and under, are most likely to come into contact with dust. (6) For multi-family dwellings and child-occupied facilities, the samples required in paragraph (d)(4) of this section shall be taken. In addition, interior window sill and floor dust  samples (either composite or single-surface samples) shall be collected and analyzed for lead concentration in the following locations:(i) Common areas adjacent to the sampled residential dwelling or child-occupied facility; and(ii) Other common areas in the building where the risk assessor determines that one or more children, age 6 and under, are likely to come into contact with dust. 40 C.F.R. § 745.227

(48)

"(1) A property manager, housing commission, or owner of a rental unit who rents or continues to rent a residential housing unit to a family with a minor child who is found to have 10 micrograms or more of lead per deciliter of venous blood is subject to the penalties provided under subsection (3) if all of the following apply: (a) The property manager, housing commission, or owner of the rental unit has prior actual knowledge that the rental unit contains a lead-based paint hazard. (b) At least ninety days have passed since the property manager, housing commission, or owner of the rental unit had actual knowledge of the lead paint hazard. (c) The property manager, housing commission, or owner of the rental unit has not acted in good faith to reduce the lead paint hazards through interim controls or abatement or a combination of interim controls and abatement. (2) A property manager, housing commission, or owner of the rental unit is presumed to have prior actual knowledge that a unit contains a lead-based paint hazard only if 1 of the following applies: (a) The property manager, housing commission, or owner of the rental unit signed an acknowledgment of the hazard as a result of a risk assessment under this chapter at the time the risk assessment was made. (b) The property manager, housing commission, or owner of the rental unit was served as a result of a risk assessment under this chapter with notice of the hazard by first-class mail and a return receipt of that service was obtained." M.C.L.A. § 333.5475a.   The Defendants habitually violated each lead hazard statute and or regulation cited in this complaint, and

deliberately avoided compliance with several city ordinances, state, and federal laws on a consistent basis.   For several years, the Defendants acted so reckless, indifferent, and outrageous in their nonfeasance towards their non-discretionary duties, that their habitual statutory violations demonstrated a substantial and dangerous lack of concern for whether injuries resulted to the Plaintiffs. The Defendants' habitual failures to comply with federal and state safe drinking water regulations continue to present

(49)

The Defendants showed gross negligence when they habitually failed to comply with a myriad of statutes controlling the regulation of lead-based hazards in residential leasing, thereby displaying willful disregard to the legislated precautions and measures that attend to the safety of the public. In doing so, the Defendants showed a shocking disregard for the substantial risks of harm and injuries they ultimately caused to the Plaintiffs due to their compliance failures.   The habitual compliance failures of these Defendants has caused irreparable, life-long injuries to several young children, their siblings, and parents.

(50)

## COUNT VI.

## CONSTITUTIONAL TORT OF ASSAULT-- ALL DEFENDANTS

(51)

The Plaintiffs reallege paragraphs 1-52.

(52)

By intentionally and purposefully maintaining a habitual practice of denying these Plaintiffs equal protection under the law through deliberate and consistent violations of lead hazard regulations, like failing to disclose the history of lead in the unit, failing to warn about the potential for a lead hazard, refusing to inspect for lead, and electing not to remedy the presence of lead-contamination throughout the term of their lease with the Plaintiffs, the Defendants caused an egregious assault on the Plaintiffs.

(53)

"Absent lawful authority, invasion of one's body is an indignity, an assault, and a trespass prohibited at common law." Guertin v. State, 912 F.3d 907 (6th Cir. 2019), cert. denied sub nom. City of Flint, Michigan v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and cert. denied sub nom. Busch v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).  "Under Michigan law, an "assault" is defined as an attempt to commit a battery or an unlawful act which places another person in reasonable apprehension of receiving an immediate battery." Moher v. United States, 875 F. Supp. 2d 739 (W.D. Mich. 2012).  To recover civil damages for assault under Michigan law, a plaintiff must show an intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of

another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact. <u>Moher v. United States</u>, 875 F. Supp. 2d 739 (W.D. Mich. 2012).

(54)

From the initiation of their lease with the Defendants, the Plaintiffs were forced to unknowingly digest, bathe in, and perform all of their daily activities in  neurotoxic lead contamination because the Defendants knowingly and deliberately leased them a substantial toxic-lead hazard.  For several years, the Plaintiffs were confronted with offensive toxic contaminants, causing shock, anxiety, apprehension, and mental anguish once the facts of their on-going assault were revealed.

(55)

## COUNT VII.

## CONSTITUTIONAL TORT OF BATTERY- ALL DEFENDANTS

(56)

The Plaintiffs reallege paragraphs 1-56.

(57)

For approximately one thousand and eighty consecutive days, the Plaintiffs Class unknowingly digested, bathed in, and otherwise came into harmful, unwanted contact with neurotoxic lead contaminants because of the Defendant's intentional actions of willfully and knowingly selling toxic water.  There is currently a two-year

abatement plan to resolve the Benton Harbor, MI Lead-Water Crisis, causing the Plaintiffs to endure continued unwanted harmful contact for the foreseeable future.

(58)

Under Michigan law, a "battery" is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person; it is not necessary that the touching cause an injury. <u>Lakin v. Rund</u>, 318 Mich. App. 127, 896 N.W.2d 76 (2016).  Becoming aware of the extremely high toxicity of their rental unit only after the confirmed lead poisoning of the children, the Plaintiffs learned of an on-going battery that lasted years and caused by their dangerous contact with toxic lead in their living space.

(59)

Each and every time the Plaintiffs were present in the duplex they leased, they suffered an intentional, unconsented, offensive, and harmful touching of their person because the Defendants knowingly caused them to be present and directly injured by contact with toxic lead contaminants.

(60)

## COUNT VIII.

## CONSTITUTIONAL TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – (Defendant Open Doors Kalamazoo)

(61)

The Plaintiffs reallege paragraphs 1-61.

(62)

The Defendant's unconstitutional, intentional, bad-faith breach of their statutory duties, coupled with their outrageous conduct of knowingly, secretly, and deliberately leasing toxic lead infested duplex for three years, housing the eight person family in a single hotel room after breaking warranties, and completely removing all lodging accommodations while the Plaintiff was eight months pregnant was reckless and shocking to the conscious of any reasonable person.   The Defendants actions and nonfeasance permanently damaged the neurosystems of the minor Plaintiffs and caused their parents and siblings to suffer extremely high levels of anxiety, stress, humiliation, and mental anguish.

(63)

The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. Doe v. Roman Cath. Archbishop of Archdiocese of Detroit, 264 Mich. App. 632, 692 N.W.2d 398 (2004).   The test for whether conduct is sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!". Swain v. Morse, 332 Mich. App. 510, 957 N.W.2d 396 (2020),

appeal denied, 957 N.W.2d 338 (Mich. 2021).   Under Michigan law, "hedonic damages" refers to damages for the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment, and inconvenience affecting an individual's normal pursuits and pleasures of life. M.C.L.A. § 600.2922(6). Blair v. Harris, 993 F. Supp. 2d 721 (E.D. Mich. 2014).   It is for the trial court to initially determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery in a suit alleging intentional infliction of emotional distress. Swain v. Morse, 332 Mich. App. 510, 957 N.W.2d 396 (2020), appeal denied, 957 N.W.2d 338 (Mich. 2021).

(64)

A 2017 study into the effects of lead (Pb) ingestion in children revealed: "With increasing Pb levels, children exhibit higher levels of hostile distrust and oppositional defiant behaviors, were more dissatisfied and uncertain about their emotions, and had difficulties with communication. These significant associations were found within a range of blood Pb levels from 0.19 to 3.25 μg/dL, well below the "reference value" for children of >5 μg/dL." (Gump & Dykas, *High Normal Lead and Mercury Exposures: Psychological and Behavioral Problems in Children* 2021). According to this research study, lead levels well below the federal regulation limits can harmfully affect the mental states of children.   A research study focusing on the effects of low-level lead exposure in adults revealed: "In these young adults with low levels of lead exposure, higher

blood lead levels were associated with increased odds of major depression and panic disorders. Exposure to lead at levels generally considered safe could result in adverse mental health outcomes." (Bouchard et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults | Adolescent Medicine | JAMA Psychiatry | JAMA Network* 2021). If it is known that even low-level lead exposure can cause major depression and panic disorders in adults, a reasonably informed person would be shocked and outraged at the Defendants knowingly and purposely leasing a lead infested duplex to the Plaintiff-family.

(65)

The Defendants acted outrageous and reckless when they intentionally caused and allowed neurotoxic, lead-hazard to be leased for three consecutive years without warning, and then forcing them into homelessness when they demanded what they contracted for; a fact that would arouse and shock the consciousness of any member of a civilized society, causing them to exclaim, "Outrageous!"  The Plaintiff Class seeks punitive, compensatory, hedonic, and equitable damages for the foul and abhorrent harms they have and continue to suffer.

(66)

## COUNT IX.

## VIOLATIONS OF SEC. 1983 & SEC. 1985: CONSPIRACY TO VIOLATE CIVIL RIGHTS – (Defendant Open Doors Kalamazoo)

(67)

The Plaintiffs reallege paragraphs 1-67.

(68)

The Defendants acted out a conspiracy to violate civil rights when they knowingly and deliberately sought to lease statutorily inadequate homes to Black American citizens for their own pecuniary gain by conspiring to avoid acting on their statutory residential leasing duties while receiving federal funds and assistance.

(69)

To state a claim of civil conspiracy, under 42 USC § 1985, the plaintiff must establish (1) a conspiracy involving two or more persons ; (2) for the purpose of depriving a person or class of persons the equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen. *Collyer v. Darling,* 98 F.3d 211, 233 (6th Cir. 1996), *citing Johnson v. Hills & Dales Gen. Hosp.,* 40 F.3d 837, 839 (6th Cir. 1994), *cert. denied,* 514 U.S. 1066 (1995). The plaintiff must also show some racial or other class based individually discriminatory animus behind the conspirators' actions. *Collyer,* 98 F.3d at 233, *citing Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263 (1993). *LaPine v. Vilgos*, No. 2:09-cv-214, at *5 (W.D. Mich. Nov. 30, 2012).  The Plaintiffs assert that two more persons employed by Open Doors Kalamazoo sought and did avoid acting on the statutory residential

leasing mandates relating to lead-based hazards for their Black American program participants, and that several actions were taken by the Defendants in furtherance of their pecuniary goal lease homes at the lowest expense possible and to place Black Americans in the most hazardous homes, in violation of their fourteenth amendment equal protection rights and causing quality of life diminishing, irreparable injuries, mental anguish, and economic damages.

(70)

"To prove a civil conspiracy under 42 U.S.C. § 1983, a plaintiff must show that a defendant formed a plan or objective with others to violate her constitutional or federal statutory rights. *See Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)" *Partin v. Davis*, No. 16-5811, at *15 (6th Cir. Jan. 13, 2017).  "With regard to Plaintiffs' conspiracy claims, the Court notes that a civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). Plaintiffs must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive Plaintiffs of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to Plaintiffs. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, Plaintiffs must plead a conspiracy with particularity." *Berryman v. Washington*, No.

1:18-cv-1317, at *10 (W.D. Mich. Aug. 28, 2019).  The Plaintiffs assert that two or more persons within the Open Doors Defendant organization formed a plan and objective to injure the Plaintiffs in return for their asserting their rights to be made whole for their injuries by taking actions first to blame them for their own lead poisoning and then to force them into homelessness by outright breach of all of their contracted lease obligations.

(71)

The Defendants, through their intentional actions of planning and acting to deny these Plaintiffs equal protection under the laws of the land, by attempting to paint them as unfit parents, unclean, and the cause of their lead poisoning, and then deliberately acting to force them into homelessness in retaliation for pursuing this lawsuit, the Defendant acted out a conspiracy to violate civil rights.

(72)

## COUNT X.

### UNJUST ENRICHMENT –(Defendants Open Doors Kalamazoo)

(73)

The Plaintiffs reallege paragraphs 1-73.

(74)

The Defendants, as a licenced non-profit entity, bonafide sellers in regulated commerce, have been unjustly enriched by receiving rent payments from the

Plaintiffs, made in good faith, and delivering a contaminated toxic-hazard in bad faith by knowing at the time of leasing, that the unit had an extensive lead hazard history and had not been properly inspected nor remediated.

(75)

"For any state that recognizes the cause of action, the typical elements of a state-law claim for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted the benefit; and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit." Chapman v. Gen. Motors LLC, No. 219CV12333TGBDRG, 2021 WL 1286612 (E.D. Mich. Mar. 31, 2021). Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, a person who has been unjustly enriched at the expense of another is required to make restitution to the other. Morris Pumps v. Centerline Piping, Inc., 273 Mich. App. 187, 729 N.W.2d 898 (2006).  The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. Morris Pumps v. Centerline Piping, Inc., 273 Mich. App. 187, 729 N.W.2d 898 (2006).

(76)

Several of these Plaintiffs have been confirmed to be poisoned by lead from the Defendants rental unit.  The Defendants should not be allowed to be enriched for

poisoning the Plaintiffs and these Plaintiffs seek to be made whole for the inadequate, unjust exchanges that took place over the course of the lease agreement.

(77)

## COUNT XI.

## BREACH OF COVENANTS: LEASE WARRANTY VIOLATIONS & PREMISES LIABILITY – (Defendant Open Doors Kalamazoo)

(78)

Plaintiffs reallege paragraphs 1-78.

(79)

Defendant Open Doors Kalamazoo breached their housing warranties when they leased a rental unit unfit for the purposes for which it was contracted.

(80)

"(1) In every lease or license of residential premises, the lessor or licensor covenants: (a) That the premises and all common areas are fit for the use intended by the parties. (b) To keep the premises in reasonable repair during the term of the lease or license, and to comply with the applicable health and safety laws of the state and of the local unit of government where the premises are located, except when the disrepair or violation of the applicable health or safety laws has been caused by the tenants wilful or irresponsible conduct or lack of conduct." M.C.L.A. § 554.139.

(81)

"A claim based on the condition of the premises is a premises liability claim." *Finazzo v. Fire Equip. Co.*, 918 N.W.2d 200, 205 (Mich. Ct. App. 2018). "To prevail on a premises-liability claim, [a] plaintiff[] must establish that defendants owed [her] a duty of care." *Est. of Livings v. Sage's Inv. Grp., LLC*, 968 N.W.2d 397, 402 (Mich. 2021). "The duty element represents the legal obligation that arises from the relationship between the parties." *Id. Wenzel v. Tremonti*, 1:21-cv-908, at *4 (W.D. Mich. Dec. 15, 2022).

(82)

"There are three "categories for persons who enter upon the land or premises of another: (1) trespasser, (2) licensee, or (3) invitee." *Stitt v. Holland Abundant Life Fellowship*, 614 N.W.2d 88, 91 (Mich. 2000). "Each of these categories corresponds to a different standard of care that is owed to those injured on the owner's premises." *Id.* Here, the parties dispute whether Plaintiff was a licensee or an invitee: "A 'licensee' is a person who is privileged to enter the land . . . by virtue of the possessor's consent." *Id.* "A landowner owes a licensee a duty only to warn the licensee of any hidden dangers the owner knows or has reason to know of, if the licensee does not know or have reason to know of the dangers involved. The landowner owes no duty of inspection or affirmative care to make the premises safe for the licensee's visit." *Id.* at 91-92. A possessor of land is subject to liability for

physical harm caused to licensees by a condition on the land if, but only if, (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and (c) the licensees do not know or have reason to know of the condition and the risk involved. *Wenzel v. Tremonti*, 1:21-cv-908, at *4-5 (W.D. Mich. Dec. 15, 2022).

(83)

The Defendants owed these Plaintiffs a duty of care pursuant to their contractual relationship as lessor and lessee.  Despite making warranties as to the fitness of the rental unit for the purposes of traditional habitation, which includes religious worship, the Defendants failed to warn the Plaintiffs of hidden dangers of toxic lead contamination presenting an imminent danger for several years. The Defendants acted out a habitual custom of failing "to comply with the applicable health and safety laws of the state and of the local unit of government where the premises" is located, causing egregious, irreparable injuries to the Plaintiffs.

(84)

## FRAUDULENT MISREPRESENTATION AND FRAUDULENT

## CONCEALMENT - (Defendant Open Doors Kalamazoo)

(85)

Defendant Open Doors Kalamazoo committed fraudulent misrepresentation when their leasing agent stated to the Plaintiff Mrs, Kyla White, that the residence at issue did not have lead nor a history of lead when they knew it was factually incorrect. The Defendant committed fraudulent concealment when they failed to disclose the lead hazard history at 1217 North Ave despite having a statutory, non-discretionary duty to do so.

(86)

"The determination of this case calls for examination of the principles applicable when remedies are sought for fraud in the execution of a contract." *Jack Mann Chevrolet Co. v. Associates Inv. Co.*, 125 F.2d 778, 782 (6th Cir. 1942).  Fraud, "may be consummated by suppression of facts and of the truth, as well as by open false assertions," if there is a "legal or equitable duty of disclosure." *Id.* at 125, 313 N.W.2d 77. There is an equitable duty of disclosure in a business transaction when "circumstances surrounding a particular transaction are such as to require the giving of information. . . ." *Ainscough v. O'Shaughnessey,* 346 Mich. 307, 316, 78 N.W.2d 209 (1956). *See also Black,* 412 Mich. 99, 124-28, 313 N.W.2d 77 (1981); *Hand v.*

*Dayton-Hudson*, 775 F.2d 757, 759 (6th Cir. 1985). In these facts, the Defendant made an intentional or reckless misrepresentation that was relied upon by the Plaintiff and caused serious irreparable harm to herself and children. Furthermore, because the Defendant had a statutory duty to know and relay the proper information, their failure to do so constitutes a fraudulent concealment.

(87)

"Michigan law recognizes "several interrelated but distinct common-law doctrines-loosely aggregated under the rubric of 'fraud'-that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012). The theories raised by State Farm are: (1) "actionable fraud, also known as fraudulent misrepresentation"; (2) "silent fraud, also known as fraudulent concealment"; and (3) "innocent misrepresentation." *Id.* To have actionable fraud, it must appear: (1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. *Titan Ins.*, 817 N.W.2d at 567-68 (quoting *Candler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919)). Silent fraud occurs where this is a legal or equitable duty of disclosure, such that "suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood[.]" *Id.* at 569. An insurance

applicant has a duty to be truthful when applying for insurance. *See Ferris v. Home Life Assur. Co.*, 76 N.W. 1041, 1042 (Mich. 1898). However, "an insured is not required to disclose information not requested by its insurer[.]" *Ill. Nat'l Ins. Co. v. AlixPartners LLP*, No. 337564, 2019 WL 939018, at *7 (Mich. Ct. App. Feb. 26, 2019). This is so because "the insurer is assumed to know the extent of the information desired, and to seek it, and cannot avoid liability by claiming there was concealment . . . when it did not ask about such a matter and called for no such information in its written application." *Federal Land Bank of St. Paul v. Edwards*, 247 N.W. 147, 149 (Mich. 1933). Thus, to prevail under a theory of silent fraud, State Farm must show that Ford had a duty to disclose the information at issue and that he "suppressed [the truth] with the intent to defraud." *Titan Ins.*, 871 N.W.2d at 569." An innocent misrepresentation occurs where "'there was in fact a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose[.]'" *Id.* at 568 (quoting *U.S. Fidelity & Guaranty Co. v. Black*, 313 N.W.2d 77, 83 (Mich. 1981)). Under this theory, even innocent and unintentional misrepresentations by the insured can give the insurer a right to rescind, so long as the insurer relied upon the misrepresentation. *U.S. Fidelity*, 313 N.W.2d at 85. The first and third theories require an objectively false or misleading statement by the defendant. State Farm's "subjective misunderstanding of information that is not objectively false or misleading cannot mean that [Plaintiff]

has committed the tort of fraudulent misrepresentation." *Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 549 (Mich. 2000). The second theory, silent fraud, requires a duty to disclose and the suppression of the truth with intent to defraud. *Ford v. State Farm Fire & Cas. Co.*, 1:21-cv-212, at *4-5 (W.D. Mich. Nov. 7, 2022).  These Plaintiffs assert that the information told to them, namely that the residence was lead free and did not have a lead hazard history, was categorically incorrect and false. The Defendants knew, or had a statutory duty to know that the home they were leasing was lead infested and possessed a long lead hazard history, and recklessly or purposely misled the Plaintiffs into a traumatizing, injurious lease tenure in which three young children were poisoned and an entire growing family was made homeless at the end of a viable pregnancy.

(88)

The Plaintiffs directly asked the Defendants if the home they were proposing to rent had a history of lead because they had an infant daughter with them during the leasing process.  The Defendant assured the Plaintiffs that their was not a lead hazard, nor a history, or any other reason to suspect a lead hazard at the property, while knowing that information was incorrect.  If the Defendant did not know that the information they relayed was incorrect, they had a statutory duty both know, disclose the proper and factually true lead hazard history and status with the Plaintiffs.  The Defendants committed fraudulent misrepresentation and concealment

when they delivered false, injurious information to the Plaintiffs when they had a statutory duty to disclose the true and proper information to the Plaintiffs for the protection of their health and from the exact injuries they have suffered.

(89)

## CONCLUSION

Through their willful neglect of duty. nonfeasance, and deliberate participation in a habitual pattern of failing to comply with non-discretionary duties and their own self-imposed ordinances, the Defendants caused the homelessness and lead poisoning of an innocent family who fulfilled their contractual obligations in good faith.  These Plaintiffs have suffered irreparable harm and plead with this Court to equitably remedy this miscarriage of justice before it through the adjudication of all claims by a jury of these Plaintiffs' peers.

(90)

## PLAINTIFFS REQUEST FOR REMEDIES & RELIEF

Mercifully, in the pursuit of Justice and pursuant to the aforementioned body of laws, the Plaintiffs request the following relief from this Court:

1. An Order declaring the conduct of Defendants unconstitutional.

2. An Order awarding exemplary and hedonic damages of $36,000,000.00;

3. An Order awarding compensatory, economic, and non-economic damages $12,000,000;

4. An Order awarding actual and reasonable attorney fees and litigation expenses of $800,000;

5. An Declaratory Judgment ordering the Defendants to act on their non-discretionary duties and ruling their actions, inactions, customs, and protocols unlawful.

6. An Order mandating Racial Animus & Cultural Sensitivity Training for all Open Doors Kalamazoo employees by a consulting firm of the Plaintiff's choosing.

7. An Order for all such other relief as the court deems equitable and reasonable.

Respectfully submitted,


**THE J.R. BEASON FIRM PLLC.**
By: \S\ John R. Beason III, Esq.
Attorney for the Plaintiffs
Attorney John R. Beason III
D.C. Bar No. 1721583
IBA No.: 1522438
JRBeason3@TheJRBeasonFirm.com

March 15th, 2023                              (269) 213-1426

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

TROY WHITE & KYLA WHITE,
Individually and as Next Friends
for H.W., H.W.,T.W., H.W., H.W.,
and H.W.

Plaintiffs,

                                      Case No.:

                                      Honorable Chief Judge Jonker

          v.

OPEN DOORS KALAMAZOO;
CITY OF KALAMAZOO; CITY OF
KALAMAZOO-CITY MANAGER,
JAMES K. RITSEMA, Individually
and in his official capacity,

Defendants.

_____/

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury as to all issues triable as a matter of right.

                                   Respectfully submitted,
                               **THE J.R. BEASON FIRM PLLC.**

                                 \S\ John R. Beason III, Esq._____
                                   John R. Beason III,
                                   Attorney for the Plaintiffs
                                   D.C. Bar No.: 1721583
                                   IBA Bar No.: 1522438
                                   853 McAlister St.
                                   Benton Harbor, MI 49022

**March 15th, 2023.**                    JRBeason3@TheJRBeasonFirm.com